```
         UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF KENTUCKY
             NORTHERN DIVISION AT COVINGTON
```

**CIVIL ACTION NO. 2:20-00126 (WOB-CJS)**

**CHELSEA MOBLEY,**

                                                                       **PLAINTIFF,**

**VS.**                 **MEMORANDUM OPINION AND ORDER**

**PROGRESSIVE DIRECT**
**INSURANCE COMPANY,**

                                                                 **DEFENDANT.**

Before the Court is Progressive Direct Insurance Company's Motion for Summary Judgment. (Doc. 33). Mobley responded (Doc. 39), and Progressive replied (Doc. 41). Therefore, the motion is ripe. For the following reasons, the motion will be granted.

### *Factual and Procedural History*

In February 2018, Chelsea Mobley was injured when the car she was riding in, driven by John Lang, dropped off the right side of the road and hit a utility pole. (Doc. 33-1 at 2). Mobley brought a claim against Lang, and Lang's insurance company settled the claim for $100,000, the amount of Lang's policy limit. (Doc. 33 at 1). Meanwhile, Mobley was insured by Progressive on a policy held by her father. (*See* Doc. 33-2). Mobley's attorney informed Progressive of the settlement with Lang. (Doc. 33 at 2; Doc. 39 at 2). Progressive agreed to waive its subrogation rights against

Lang and permitted the settlement to proceed. (Doc. 33 at 2; Doc. 39 at 2).

According to Mobley's mother Lisa, the $100,000 settlement with Lang's insurance carrier was insufficient to cover Mobley's injuries and resulting disabilities. (Doc. 37, Lisa Mobley Aff. ¶¶ 4, 5). So she consulted with Progressive to see whether the family insurance policy might provide additional coverage. (*Id.* ¶ 5). Progressive told her there was no "extra" coverage beyond what Mobley had gotten from Lang's insurance carrier. (*Id.* ¶ 6).

Lisa found an older copy of the family's insurance policy, which showed that the policy included underinsured motorist coverage. (*Id.* ¶ 7). She then obtained from Progressive copies of the policy that had been in effect before, at the time of, and after Mobley's accident. (*Id.* ¶ 9). She eventually told Progressive that she would be consulting an attorney, at which point Progressive agreed that Mobley's policy did include underinsured motorist coverage. (*Id.* ¶¶ 10, 11).

In March 2020, Mobley's attorney made a demand for the $100,000 policy limit under that coverage. (Doc. 33-3 at 1). He included with that demand information about Mobley's injuries: that she had suffered a concussion, that her medical bills exceeded $14,000, and records from Mobley's treating physician indicating that her body was 15% impaired, that her injuries prevented her from working and earning income, and that she would incur future

2

treatment expenses of $2,000 to $3,000 per year. (*Id.* at 1–3). The records reflected that Mobley's last doctor visit was on August 8, 2018. (*Id.* at 3).

In April, Progressive offered Mobley $20,000 to settle the underinsured motorist claim. (*Id.* at 4). Mobley's attorney rejected the offer and renewed the demand for the policy limit. (Doc. 33-4). Counsel for Progressive wrote to Mobley's attorney in June and July. (Doc. 33-5). The first letter said that Progressive was open to negotiations and offered to schedule a pre-suit medical exam for Mobley and stipulated that it would be the only exam should the case proceed to litigation. (*Id.* at 1). It also said that Progressive had no documentation about Mobley's medical condition or ability to work or attend school, and requested any new information or evidence that might be available. (*Id.*). The second letter said the same thing and requested a new demand. (*Id.* at 3).

Mobley sued in state court in August, bringing claims for breach of contract and bad faith. (*See* Doc. 1-2). Progressive removed. (Doc. 1). The Court bifurcated the two claims and stayed discovery on the bad faith claim pending the outcome of the contractual claim. (Doc. 12).

During discovery on the breach of contract claim, Progressive deposed Mobley and learned that she had recently undergone knee surgery. (Doc. 33-6 at 1). Mobley underwent an independent medical

3

exam in May 2021. (*Id.* at 3; Doc. 13). Afterwards, Progressive reevaluated Mobley's claim, mediated the case, and settled the underinsured motorist breach of contract claim for $72,500. (Doc. 33-6 at 11; *see also* Doc. 21, dismissing Mobley's underinsured motorist claim).

The Court then entered a new scheduling order (Doc. 29), and Progressive moved for summary judgment on the remaining bad faith claim in May 2023 (Doc. 33).

### *Analysis*

Progressive moves for summary judgment on Mobley's remaining bad faith claim. (*Id.*). Under federal law, summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." See *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. Id. However, "[t]he non-moving party also may not rest upon

4

its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e)(2)).

Kentucky law recognizes four categories of insurance bad faith claims: (1) common-law third-party bad faith; (2) common-law first-party bad faith; (3) statutory bad faith under the Kentucky Consumer Protection Act; and (4) statutory bad faith under the Kentucky Unfair Claims Settlement Practices Act. *World Heritage Animal Genomic Res., Inc. v. Wright*, No. 22-5828, 2023 WL 3868646, at *1 (6th Cir. June 7, 2023) (first citing Ky. Rev. Stat. § 304.12-230; then citing *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526-27 (6th Cir. 2006)).

All four categories are analyzed under the same framework, set out by the Kentucky Supreme Court in *Wittmer v. Jones*. Under that framework, a plaintiff must show:

    (1) the insurer was obligated to pay the claim under the policy;

    (2) the insurer lacked a reasonable factual or legal basis for denying the claim; and

5

> (3) the insurer knew there was no reasonable basis for the denial or acted with reckless disregard for whether such a basis existed.

*Id.* (citing *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 584 (Ky. 2021)). *See also Belt v. Cincinnati Ins. Co.*, 664 S.W.3d 524, 532 (Ky. 2022) (citing *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993)).

Here, Mobley's bad faith claim is of the statutory variety, brought under the Kentucky Unfair Claims Settlement Practices Act (the Act). (Doc. 1-2 ¶ 8; Doc. 39 at 4–5). The Act seeks to protect the public by requiring insurers to act in good faith when dealing with insureds and third-party claimants. *Belt*, 664 S.W.3d at 530–31 (first citing *State Farm Mut. Auto. Ins. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988); then citing *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 26 (Ky. 2017); and then citing *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 820–21 (Ky. 1988)). It does so by prohibiting certain settlement practices. *Id.*; Ky. Rev. Stat. § 304.12-230.

At issue here are three of those prohibited practices, found in subsections (1), (6), and (7) of the Act. (Doc. 39 at 4–5). Subsection (1) prohibits "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue[.]" Ky. Rev. Stat. § 304.12-230(1). Subsection (6) prohibits "[n]ot attempting in good faith to effectuate prompt, fair and equitable

6

settlements of claims in which liability has become reasonably clear[.]" *Id.* § 304.12-230(6). And subsection (7) prohibits "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds[.]" *Id.* § 304.12-230(7).

Although the Act enumerates those and 14 other prohibited practices, those practices alone are merely "technical violations" of the Act. *Belt*, 664 S.W.3d at 531 (citing *Wittmer*, 864 S.W.2d at 890). Technical violations are mere contractual claims and do not rise to the level of bad faith. *Id.* (citing *Wittmer*, 864 S.W.2d at 890). Instead, a plaintiff bringing a bad faith claim must satisfy the three elements laid out in *Wittmer*.

Here, Progressive does not dispute the first element because Mobley's policy included underinsured motorist coverage. (Doc. 33 at 8). So the Court will focus on the second and third elements.

### A. Element 2 — Whether Progressive lacked a reasonable basis for denying the claim

The second *Wittmer* element is whether the insurer lacks a reasonable factual or legal basis for denying the claim. *Wittmer*, 864 S.W.2d at 890. An insurer lacks a reasonable basis for denial only when liability is "beyond dispute." *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 586 (Ky. 2021) (citing *id.*). In contrast, if liability is unclear, then a bad faith claim fails as a matter

of law. *Id.* (citing *Hollaway v. Direct Gen. Ins. Co. of Miss.*, 497 S.W.3d 733, 739 (Ky. 2016)). Thus, "the second *Wittmer* element is not satisfied if an 'absolute duty to pay [the plaintiff's] claim is not clearly established' or if disputes persist about the degree of injury attributable to the insured's actions." *Martinez v. State Farm Mut. Auto. Ins. Co.*, 615 F. Supp. 3d 584, 592 (W.D. Ky. 2022) (quoting *Hollaway*, 497 S.W.3d at 739).

It's that second genre of liability—the degree of injury—that Progressive argues gave it a reasonable basis to challenge Mobley's claim. In its view, the information presented with Mobley's demand—a reported concussion, roughly $14,000 in medical bills, and an opinion from a treating physician (whom Mobley hadn't seen in about 20 months) that her body was 15% impaired—did not warrant the $100,000 policy limit that Mobley requested. (Doc. 33 at 5-6, 8-10). In other words, Progressive disputed the extent of Mobley's injuries, so liability was not beyond dispute. (*Id.* at 9). And if liability is not beyond dispute, a bad faith claim fails as a matter of law. *Mosley*, 626 S.W.3d at 586.

In response, Mobley relies on a 2000 Kentucky Supreme Court case, *Farmland Mutual Insurance Co. v. Johnson*, to argue that a dispute over the extent of the injury, alone, does not insulate Progressive from liability under the Act. (Doc. 39 at 9). *Farmland* stated, in relevant part:

8

> Although there may be differing opinions as to the value of the loss and as to the merits of replacing or repairing the damaged structure, an insurance company still is obligated under the KUCSPA to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner. . . . Among other things, the [Arizona Supreme Court] held that whether a claim or the amount of a claim is fairly debatable is a question of fact for the jury and that the fact of a disputed amount does not relieve the insurer of its duty to handle the claim fairly.

36 S.W.3d 368, 375-76 (Ky. 2000) (citing *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276 (Ariz. 2000)). Thus, Mobley argues, a dispute over "the value of the loss" or "the amount of a claim" does not automatically mean that liability is disputed.

But *Farmland* is distinguishable because it involved a claim of a wholly different character than that here. The dispute in *Farmland* involved the interpretation of provisions in a fire insurance policy for a commercial building, not the degree of injury to be covered by an auto policy. 36 S.W.3d 368. Moreover, in *Farmland* the insurer's liability was undisputed and the only remaining question was how to pay out the benefits. *See Mosley*, 626 S.W.3d at 587 (citing *Farmland*, 36 S.W.3d at 374-75). In contrast, liability here was disputed, and "when liability is not clear or disputed, an insurer may pursue its defense and contested liability until its duty under [the Act] is triggered." *Id.*

Mobley makes two other arguments as to the second *Wittmer* element. First, she suggests that current Kentucky case law on bad faith distinguishes between first- and third-party claims. (Doc.

9

39 at 9, 11-12). That is not the case. The *Wittmer* framework governs "both statutory and common law first- and third-party bad-faith claims." *Belt*, 664 S.W.3d at 532. *See also World Heritage*, 2023 WL 3868646, at *1 (noting that all four categories of Kentucky bad faith claims—regardless of whether they are common law or statutory, first-party or third-party, follow the same framework).

Second, Mobley argues that a dispute over the *value* of her case was not a dispute over *liability*. (Doc. 39 at 11-12). She posits that the only time *liability* was ever disputed "was when Mrs. Mobley disputed Progressive's misrepresentation that she had no UIM coverage and Mrs. Mosley [sic] did not agree." (*Id.* at 12). But this cramped reading of the word "liability" conflicts with case law.

A review of that case law reveals that "liability" refers not just to the contractual obligations that incur under the insurance policy, but also to the degree or extent of those obligations. *See Martinez*, 615 F. Supp. 3d at 592 (" . . . the second *Wittmer* element is not satisfied . . . if disputes persist about the degree of injury attributable to the insured's actions.") (quoting *Hollaway*, 497 S.W.3d at 739). *See also Messer v. Universal Underwriters Ins. Co.*, 598 S.W.3d 578, 584 (Ky. Ct. App. 2019) (noting that "the [*Wittmer*] Court found the insurer's disagreement over damages was a reasonable ground for disputing the claim.").

And that makes sense. If liability referred only to whether the policy covered a particular type of claim, like an underinsured motorist claim, then the second *Wittmer* element would be no different from the first. In contrast, a broader definition of liability—one that includes the degree of injury or extent of damages—turns *Wittmer* into a workable framework and properly limits bad faith claims to those situations where the insurer's liability is undisputed and the only remaining question is how it handled the claim.

Progressive has demonstrated that there is no genuine dispute of material fact as to whether it disputed the extent of Mobley's injuries. Because liability was not beyond dispute, Progressive had a reasonable basis for denying the claim, and Mobley cannot meet her burden under the second *Wittmer* element.

### B. Element 3 — Whether Progressive knew there was no reasonable basis for the denial or acted with reckless disregard for whether such a basis existed

The third *Wittmer* element is whether "the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Wittmer*, 864 S.W.2d at 890. The plaintiff must show that the insurer's "conduct was outrageous and caused the plaintiff actual damage." *Mosley*, 626 S.W.3d at 588 (first citing *Messer*, 598 S.W.3d at 588; then citing *Zurich Ins. Co. v. Mitchell*, 712 S.W.2d 340 (Ky. 1986)). Outrageous conduct is that which goes beyond negligence and

11

justifies the imposition of punitive damages. *Id.* (citing *Wittmer*, 864 S.W.2d at 890).

In short, a plaintiff must show "intentional misconduct or reckless disregard of the rights of an insured or claimant to warrant submitting the right to award punitive damages to the jury." *Wittmer*, 864 S.W.2d at 890. Examples of such conduct include misrepresenting policy provisions, using the claimant's financial struggles as leverage, focusing the investigation on evading the claim, refusing to settle until the claimant releases the insurer from liability arising from its misconduct, "lowball" offers that barely exceed damages, extensive delay in settling or requesting records, refusing to disclose policy limits, and other troubling claims-handling practices. *Belt*, 664 S.W.3d at 535 (collecting cases); *Faith v. Great West Cas. Co.*, No. 3:20-cv-458-RGJ, 2022 WL 36923, at *3 (W.D. Ky. Jan. 4, 2022).

Progressive argues that none of those circumstances is present here. Instead, this was just "everyday claims handling" and the insurer just happened to dispute the claim value. (Doc. 33 at 11–12).

Mobley's arguments are more varied. First, she points out that Progressive quoted from a case involving a third-party bad faith claim, but that this is a first-party claim limited to the language of the Act. (Doc. 39). This argument is unavailing. As discussed above, the *Wittmer* framework, including the third

12

element's requirement of outrageous conduct, governs "both statutory and common law first- and third-party bad-faith claims[.]" *Belt*, 664 S.W.3d at 532. So it doesn't matter that Mobley's claim is first-party and not third-party, statutory and not common law. The elements are the same.

Second, Mobley insists that a plaintiff need not prove outrageous conduct because the Act imposes no such requirement. (Doc. 39 at 7). She argues that a series of post-*Wittmer* cases from the Kentucky Supreme Court refined the definition of "outrageous" conduct, that "outrageous conduct" is not part of the statute, and that "Progressive argues only from an early snapshot" of cases. (*Id.* at 7–8).

This argument too is unavailing, for the same reason as the first. The most recent Kentucky Supreme Court case addressing bad faith claims, *Belt v. Cincinnati Insurance Co.*, from December 2022, explicitly states that "[t]he elements of a common law *or statutory* bad faith claim are those defined in *Wittmer*." 664 S.W.3d at 530 (emphasis added). And *Wittmer* says that before a bad faith claim can exist, there must be "'conduct that is outrageous[.]'" *Wittmer*, 864 S.W.2d at 890 (quoting Restatement (Second) Torts, § 909(2) (1979)).

Mobley's last argument fares better. She points to the affidavits she submitted, which indicate that Progressive misrepresented the provisions of her insurance policy. (Doc. 39 at

13

10). According to Lisa Mobley's affidavit, the policy included underinsured motorist coverage. (Doc. 37, Lisa Mobley Aff. ¶¶ 10, 11). But Progressive told her the policy had no such coverage. (*Id.* ¶ 14). Mobley also suggests that Progressive made her a lowball offer, thus compelling her to institute litigation. (Doc. 39 at 10). Progressive's claim records (Doc. 33-3 at 11) show that its $20,000 offer was at "the low end of [] its own evaluation of the claim[.]" *Phelps v. State Farm Mut. Auto. Ins. Co.*, 736 F.3d 697, 705 (6th Cir. 2012). Both actions—misrepresenting policy provisions and lowball offers—can be considered outrageous conduct. *Belt*, 664 S.W.3d at 535; *Faith*, 2022 WL 36923, at *3.

Therefore, taking the facts in the light most favorable to the nonmovant, as the Court is required to do on a motion for summary judgment, Mobley has identified evidence in the record to create a genuine dispute of fact as to the third *Wittmer* element. However, because Mobley cannot show a dispute of fact as to the second *Wittmer* element, her bad faith claim cannot survive summary judgment.

Therefore, it is **ORDERED** that:

(1) Progressive's Motion for Summary Judgment, (Doc. 33), be, and is hereby, **GRANTED**.

This 10th day of August, 2023



Signed By:
*William O. Bertelsman* WOB
United States District Judge

14